(No. 79686

RANDY SCHOLTENS, Appellee, v. JEFFREY SCHNEIDER *et al.* (Electrical Insurance Trustees, Appellant).

*Opinion filed September 19, 1996.*

Edwin H. Conger and David R. Shannon, of Chicago (Tenney & Bentley, of counsel), for appellant.

Michael J. Kane and Louis B. Garippo, of Kane, Obbish, Propes & Garippo, of Chicago, and Michael D. Walsh, of Palos Hills, for appellee.

James L. Coghlan, John A. Kukankos, Anita M. D'Arcy and Francis E. Stepnowski, of Coghlan, Joyce, Kukankos & D'Arcy, of Chicago, and William J. Nellis, of Rosemont, for *amicus curiae* Trustees of the Central States, Southeast & Southwest Areas Health & Welfare Fund.

Terrence K. Hegarty and Dennis Rendleman, of Springfield (David C. Nelson, of counsel), for *amicus curiae* Illinois State Bar Association.

Stewart D. Stoller and Steven E. Garstki, of Stoller & Garstki, of Chicago, for *amicus curiae* Illinois Trial Lawyers Association.

CHIEF JUSTICE BILANDIC delivered the opinion of the court:

Electrical Insurance Trustees (Trustees) appeal from an appellate court judgment that affirmed a circuit court order holding the Trustees liable under the common fund doctrine for attorney fees and costs expended in recouping the Trustees' subrogation lien. The Trustees claim that section 514 of the Employee Retirement Income Security Act of 1974 (ERISA) (29 U.S.C. § 1144 (1982)) preempts application of the common fund doctrine to self-funded employee welfare benefit plans. We hold that ERISA does not preempt application of the common fund doctrine.

The plaintiff, Randy Scholtens, an electrician, was a participant in an employee benefit plan as a member of the Illinois Brotherhood of Electrical Workers, Local 134. It is undisputed that the plan is a welfare benefit plan within the meaning of ERISA (29 U.S.C. § 1001 *et seq.* (1982)). The appellant, Trustees, administers the plan pursuant to a trust agreement between Local 134 and the Electrical Contractor Association of the City of Chicago. The plan is a self-funded benefit plan which provides medical and disability benefits to union electrical workers.

On December 22, 1989, Scholtens was injured in a non-work-related automobile accident. The accident occurred when a vehicle in which Scholtens was a passenger was struck by another vehicle. Scholtens' injuries required hospitalization and surgery. Pursuant to the plan, the Trustees paid medical bills and disability benefits totalling $42,921.75 to Scholtens for those injuries.

Scholtens subsequently retained an attorney to pursue a cause of action for damages arising out of the automobile accident. Scholtens filed a lawsuit against the two drivers involved in the accident, Jeffrey Schnei-

der and L.C. O'Banner. Prior to trial, Scholtens settled his claim against the two defendants for $100,000.

The Trustees never made an independent effort to seek reimbursement of the benefits paid to Scholtens from Schneider or O'Banner, nor did they attempt to intervene in Scholtens' pending litigation against those defendants. Following Scholtens' settlement of the lawsuit, however, the Trustees demanded full reimbursement of all of the benefits paid to Scholtens. The Trustees premised their demand on the subrogation clause contained in the benefit plan and a subrogation agreement that Scholtens signed on January 3, 1990, shortly after the accident.

The subrogation clause, which appears in the booklet explaining plan benefits to participants, provided:

"In some circumstances, such as an automobile accident, a third party may ultimately pay medical expenses for you or an enrolled dependent through an insurance settlement or otherwise. In that case, you must reimburse benefits paid by the Plans to the extent they are paid by the third party."

The subrogation agreement that Scholtens signed after his accident provided, in part:

"The undersigned hereby agrees, in consideration of money paid or to be paid by the Electrical Insurance Trustees to me as an employee under a Plan of benefits maintained by the Trustees, or to another on my behalf as such employee, because of loss or damage for which I or my dependent may have a cause of action against a third party who caused this loss or damage, the Trustees shall be subrogated, to the extent of such payment, to any and all recovery by me or my dependent, and such right shall be assigned to the Trustees by me as a condition of the payment of such money by the Trustees."

Faced with the demand for complete reimbursement by the Trustees, Scholtens' attorney filed a petition to adjudicate the Trustees' subrogation lien in the court where Scholtens' tort action was pending. The trial

court applied the common fund doctrine and directed that the amount Scholtens owed to the Trustees would be reduced in accordance with the attorney fees and costs incurred in the litigation from $42,921.75 to $28,286.76. The trial court stated that it did not adjudicate the Trustees' rights under the terms of either the ERISA plan or the subrogation agreement, but simply applied the common fund doctrine to the facts before it.

The appellate court affirmed, rejecting the Trustees' claim that ERISA preempted the application of the common fund doctrine. We allowed the Trustees' petition for leave to appeal. 155 Ill. 2d R. 315. *Amicus* briefs were filed on behalf of both the appellant and the appellee.

## ANALYSIS

The issue in this appeal is whether section 514 of ERISA (29 U.S.C. § 1144 (1982)) preempts application of the common fund doctrine to self-funded employee benefit plans. The question of whether a federal statute, such as ERISA, preempts a particular state law is one of congressional intent. *Metropolitan Life Insurance Co. v. Massachusetts,* 471 U.S. 724, 738, 85 L. Ed. 2d 728, 739, 105 S. Ct. 2380, 2388 (1985). Congress' intent to preempt state law may be explicitly stated in the statute's language or implicitly contained in its structure and purpose. *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 77 L. Ed. 2d 490, 500, 103 S. Ct. 2890, 2900 (1983). In analyzing claims of preemption, however, the Supreme Court has "never assumed lightly that Congress has derogated state regulation." *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.,* 514 U.S. 645, 654, 131 L. Ed. 2d 695, 704, 115 S. Ct. 1671, 1676 (1995). Instead, the Court instructs that the analysis should begin with the presumption that Congress did not intend to supplant state law.

*Travelers*, 514 U.S. at 654, 131 L. Ed. 2d at 704, 115 S. Ct. at 1676.

In ascertaining congressional intent, the inquiry necessarily begins with an analysis of the language of the statute. *Travelers*, 514 U.S. at 655, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677. The text of ERISA's preemption provision, section 514(a), is expansive. Section 514(a) provides, with some exceptions not relevant here, that:

> "the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State laws insofar as they may now or hereafter *relate to* any employee benefit plan." (Emphasis added.) 29 U.S.C. § 1144(a) (1982).

A brief discussion of the manner in which the Supreme Court has interpreted this provision and the progression of law relating thereto is helpful in resolving the question presented here.

## A

Prior to 1995, the Supreme Court cases analyzing preemption claims under ERISA relied heavily upon the language of the preemption provision and dictionary definitions of the phrase "relate to" as the primary guides to determining whether a particular state law was preempted. While acknowledging that ERISA's preemption provisions were not models of legislative drafting, the Supreme Court found that section 514(a) was "conspicuous for its breadth." *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 112 L. Ed. 2d 356, 364, 111 S. Ct. 403, 407 (1990). The Court rejected an attempt to limit the scope of preemption to state laws relating to specific subjects covered by ERISA or specifically designed to affect employee benefit plans. *Shaw*, 463 U.S. at 98, 77 L. Ed. 2d at 501, 103 S. Ct. at 2900. Instead, the Court stated that the phrase "relate to" must be given a " 'broad common-sense meaning' " (*Metropolitan Life Insurance Co.*, 471 U.S. at 739, 85 L. Ed. 2d at 740, 105 S. Ct. at 2389), and that a state law "relates to" an em-

ployee benefit plan "in the normal sense of the phrase, if it has a connection with or reference to such a plan." *Shaw*, 463 U.S. at 96-97, 77 L. Ed. 2d at 501, 103 S. Ct. at 2900.

For more than one decade, the Court relied upon the text of section 514(a) and, particularly, this definition of the phrase "relate to" as the basis for deciding preemption claims. Applying this analysis, the Court determined that *any* state law which singles out plans encompassed by ERISA for special treatment "relates to" such plans and is preempted, even if consistent with ERISA's substantive requirements. *Mackey v. Lanier Collections Agency & Service, Inc.*, 486 U.S. 825, 829, 100 L. Ed. 2d 836, 843-44, 108 S. Ct. 2182, 2185 (1988) (garnishment statute that specifically referred to ERISA plans was preempted, but general garnishment statute did not "relate to" ERISA plans and was not preempted). The Court also determined that a state law may "relate to" an employee benefit plan " 'even if the law is not specifically designed to affect such plans, or the effect is only indirect.' " *District of Columbia v. Greater Washington Board of Trade*, 506 U.S. 125, 130, 121 L. Ed. 2d 513, 520, 113 S. Ct. 580, 583 (1992), quoting *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 139, 112 L. Ed. 2d 474, 484, 111 S. Ct. 478, 483. Accordingly, state laws that required that employee benefits plans be structured in a particular manner were found to "relate to" such plans and were preempted. See, *e.g.*, *Shaw*, 463 U.S. at 96-97, 77 L. Ed. 2d at 501, 103 S. Ct. at 2900 (state statute that prohibited discrimination against pregnancy and thereby mandated that employers structure their benefit plans to cover pregnancy-related disability, "related to" benefit plans and was preempted); *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 112 L. Ed. 2d 356, 364, 111 S. Ct. 403, 407-08 (1990) (state statute that prohibited benefit plans from enforcing subrogation liens in actions involv-

ing motor vehicle accidents "relate[d] to" benefit plans and was preempted). The Court cautioned, however, that the scope of the preemption provision was not unlimited and that "[s]ome state actions may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Shaw*, 463 U.S. at 100 n.21, 77 L. Ed. 2d at 503 n.21, 103 S. Ct. at 2901 n.21.

In its most recent decision interpreting ERISA's preemption clause, however, the Supreme Court expressed exasperation with this strictly textual approach. In *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Insurance Co.*, 514 U.S. 645, 131 L. Ed. 2d 695, 115 S. Ct. 1671 (1995), the Court questioned whether the words of limitation in section 514(a) ("insofar as they ... relate") did much limiting, and cautioned that "[i]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes preemption would never run its course, for 'really, universally, relations stop nowhere.' " *Travelers*, 514 U.S. at 655, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677, quoting H. James, Roderick Hudson xli (New York ed., World's Classics (1980)). The Court stressed that such an expansive interpretation of the preemption clause would "read Congress's words of limitation as mere sham, and *** read the presumption against preemption out of the law whenever Congress speaks to the matter with generality." *Travelers*, 514 U.S. at 655, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677. Having determined that "infinite relations cannot be the measure of preemption" (*Travelers*, 514 U.S. at 656, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677), the Court concluded:

> "We simply must go beyond the unhelpful text and the frustrating difficulty of defining its key term, and look instead to the objectives of the ERISA statute as a guide to the scope of the state law that Congress understood would survive." *Travelers*, 514 U.S. at 656, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677.

*Travelers* therefore announced a fundamental shift in emphasis away from mere interpretation of the words of ERISA's preemption provision toward an analysis of Congress' objectives in enacting ERISA. Accordingly, in considering whether section 514(a) preempts application of the common fund doctrine to self-funded ERISA benefit plans, we must consider not only the language of the preemption provision, but also the structure and purpose of the statute as a whole.

Congress enacted ERISA for the express purpose of providing safeguards to protect the interests of participants in employee benefit plans. 29 U.S.C. § 1001(b) (1982). Congress determined that "the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered" because of a lack of uniformity in the regulation of such plans. Accordingly, Congress enacted a comprehensive statute that subjects plans providing employees with fringe benefits to federal regulation. *Shaw*, 463 U.S. at 90, 77 L. Ed. 2d at 497, 103 S. Ct. at 2896. The statute imposes participation, funding, and vesting requirements on pension plans (29 U.S.C. §§ 1051 through 1086 (1982)) and sets uniform standards, including rules concerning reporting, disclosure and fiduciary responsibility for both pension and welfare benefit plans (29 U.S.C. §§ 1021 through 1031, 1101 through 1114 (1982)). ERISA does not require employers to provide any particular benefits to employees and does not speak on the subject of subrogation. The statute does not require, bar or regulate the content of subrogation clauses in welfare benefit plans.

In *Travelers*, the Court explored the specific question of congressional intent as it relates to the enactment of ERISA's preemption clause. Section 514(a) of ERISA (29 U.S.C. § 1144(a) (1982)) reflects Congress' intent to establish regulation of employee benefit plans as an exclusively federal concern. The Court noted that the purpose of section 514(a) is to ensure that the

administrative practices concerning employee benefit plans are governed by a uniform body of benefit law, in order to minimize the administrative and financial burden that employers would face if required to comply with conflicting directives among states or between states and the federal government. Congress recognized that obligating an employer to satisfy the varied and perhaps conflicting requirements of particular state laws regulating employee benefits would make administration of a nationwide benefit plan more difficult and inefficient, which might lead employers with existing employee benefit plans to reduce benefits, and lead employers without such plans to refrain from adopting them. *Fort Halifax Packing Co. v. Coyne*, 482 U.S. 1, 96 L. Ed. 2d 1, 107 S. Ct. 2211 (1987). Thus, the basic purpose of the preemption provision in ERISA (29 U.S.C. § 1144(a) (1982)) is to "avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *Travelers*, 514 U.S. at 657, 131 L. Ed. 2d at 706, 115 S. Ct. at 1677-78.

B

With these general principles in mind, we consider whether section 514(a) of ERISA preempts application of the Illinois common fund doctrine. We first utilize the textual approach. Under this approach, a law that "relates to" benefit plans, in that it "refers to or has a connection to" such plans, is preempted.

In determining whether the common fund doctrine "refers to or has a connection to" ERISA plans, it is necessary to briefly discuss the nature of that doctrine. In general, each party to litigation in the United States bears its own attorney fees, absent a specific fee-shifting statute. Over time, courts have created several equitable exceptions to this "American Rule." One of the earliest, and most prevalent, exceptions is the common fund doctrine. This doctrine has been recognized and applied

in the United States Supreme Court, the lower federal courts, and in the courts of virtually every state in the Union, including Illinois. See *Baier v. State Farm Insurance Co.*, 66 Ill. 2d 119 (1977); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 164, 83 L. Ed. 1184, 1186, 59 S. Ct. 777, 779 (1939) (fee award from fund generated in class action is within "the historic equity jurisdiction of the federal courts"); see generally 42 A.L.R. Fed. 134 (1979); 23 A.L.R.5th 241 (1994); S. Speiser, Attorneys' Fees (1973).

The common fund doctrine permits a party who creates, preserves, or increases the value of a fund in which others have an ownership interest to be reimbursed from that fund for litigation expenses incurred, including counsel fees. *Brundidge v. Glendale Federal Bank, F.S.B.*, 168 Ill. 2d 235 (1995). It is now well established that "a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478, 62 L. Ed. 2d 676, 681, 100 S. Ct. 745, 749 (1980). The underlying justification for reimbursing attorneys from a common fund, as explained by the United States Supreme Court in three early cases, is that, unless the costs of litigation are spread to the beneficiaries of the fund, they will be unjustly enriched by the attorney's efforts. See *Sprague*, 307 U.S. at 166-67, 83 L. Ed. at 1187, 59 S. Ct. at 779-80; *Central R.R. & Banking Co. v. Pettus*, 113 U.S. 116, 126-27, 28 L. Ed. 915, 919, 5 S. Ct. 387, 392-93 (1885); *Trustees of the Internal Improvement Fund v. Greenough*, 105 U.S. 527, 532, 26 L. Ed. 1157, 1160 (1882); see also *Ryan v. City of Chicago*, 274 Ill. App. 3d 913 (1995).

The common fund doctrine is a common law rule of general application. It does not single out or expressly refer to ERISA plans, nor is it predicated upon their ex-

istence. It applies generally to all funds created, increased or preserved by a party in which others have an ownership interest. In this respect, the common fund doctrine is similar to the other laws of general applicability that the Supreme Court has held affect employee benefit plans in too tenuous, remote or peripheral a manner to warrant a finding that the law "relates to" the plan. For example, in *Mackey v. Lanier Collections Agency & Service, Inc.*, 486 U.S. 825, 100 L. Ed. 2d 836, 108 S. Ct. 2182 (1988), the Supreme Court held that a general state garnishment statute did not "relate to" employee benefit plans and fell outside the scope of ERISA's preemption provision. In reaching this conclusion, the Court found that Congress did not intend to forbid the use of generally applicable state-law mechanisms of executing judgments against ERISA welfare benefit plans. *Mackey*, 486 U.S. at 831, 100 L. Ed. 2d at 845, 108 S. Ct. at 2186; *cf. Greater Washington Board of Trade*, 506 U.S. at 130, 121 L. Ed. 2d at 520, 113 S. Ct. at 583 (striking down District of Columbia law that "specifically refers to welfare benefit plans regulated by ERISA and on that basis alone is pre-empted").

Although the common fund doctrine does not expressly refer to ERISA plans, our inquiry cannot end here. *Travelers* instructs courts to go beyond the unhelpful text of section 514(a) and look instead to the purposes of ERISA as a guide to determining whether a particular state law is preempted. *Travelers*, 514 U.S. 645, 131 L. Ed. 2d 695, 115 S. Ct. 1671. Thus, we must inquire whether preemption would serve the basic purpose of section 514(a), namely, "to avoid a multiplicity of regulation in order to permit the nationally uniform administration of employee benefit plans." *Travelers*, 514 U.S. at 657, 131 L. Ed. 2d at 706, 115 S. Ct. at 1677-78.

1

The Trustees and *amici* argue that the common fund

doctrine frustrates this goal for two reasons. First, they claim that application of the common fund doctrine frustrates uniform administration of nationwide benefit plans because it prevents plan administrators in Illinois from enforcing the subrogation rights which are part of written plan agreements. They argue that the common fund doctrine is, in substance, an antisubrogation law similar to the Pennsylvania statute the Supreme Court held was preempted by ERISA in *FMC Corp. v. Holliday*.

We note initially that the Trustees' characterization of the common fund doctrine as a law unique to Illinois is misguided. As earlier discussed, the common fund doctrine has been recognized and applied in the United States Supreme Court, the lower federal courts, and in courts of virtually every state. Accordingly, the Trustees' portrayal of the common fund doctrine as a law restricted to Illinois is not persuasive. Rather, the law, like the general garnishment statute at issue in *Mackey*, exists in some form throughout the nation.

The common fund doctrine has, in fact, been applied in a number of federal cases involving ERISA plans. See, *e.g.*, *Carpenter v. Modern Drop Forge Co.*, 919 F. Supp. 1198 (N.D. Ind. 1995); *Dugan v. Nickla*, 763 F. Supp. 981 (N.D. Ill. 1991); *Serembus v. Mathwig*, 817 F. Supp. 1414 (E.D. Wis. 1992); *Cutting v. Jerome Foods, Inc.*, 820 F. Supp. 1146 (W.D. Wis. 1991). These courts applied the common fund doctrine as a matter of federal common law and required ERISA benefit plans to pay for legal services rendered in protecting the plan's subrogation lien. But see *Ryan v. Federal Express Corp.*, 78 F.3d 123 (3d Cir. 1996) (refusing to require ERISA plan to pay a proportionate share of attorney fees in recovering subrogation liens as a matter of federal common law).

We are also unpersuaded by the Trustees' character-

ization of the common fund doctrine as an antisubrogation law similar to that found preempted in *FMC Corp. v. Holliday*. Although the common fund doctrine may be invoked in actions involving subrogation liens, it cannot appropriately be characterized as an "antisubrogation" law. On the contrary, the common fund doctrine has been applied in many types of cases covering a large range of civil litigation. S. Speiser, Attorney Fees § 11.13, at 417 (1973). The doctrine is most frequently applied in class actions brought by, and on behalf of, creditors, taxpayers, public utility customers, trust beneficiaries, decedents' estates, labor union members, and shareholders of corporations. See S. Speiser, Attorney Fees §§ 11.13 through 11.21 (1973) (and cases cited therein); see also *Boeing Co. v. Van Gemert*, 444 U.S. 472, 62 L. Ed. 2d 676, 100 S. Ct. 745 (1980) (class action by bondholders against corporation); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 396-97, 24 L. Ed. 2d 593, 609, 90 S. Ct. 616, 628 (1970) (stockholder's derivative action); *Sprague v. Ticonic National Bank*, 307 U.S. 161, 164, 83 L. Ed. 1184, 1185-86, 59 S. Ct. 777, 779 (1939) (action to protect a trust fund); *Brundidge v. Glendale Federal Bank*, 168 Ill. 2d 235 (1995).

Moreover, the common fund doctrine bears no resemblance to the Pennsylvania antisubrogation statute at issue in *FMC Corp. v. Holliday*. That statute prohibited plans from requiring reimbursement of medical expenses from beneficiaries who recovered from third-party tortfeasors in actions arising out of motor vehicle accidents. The statute conflicted with a subrogation clause contained in a self-funded employee welfare benefit plan that required plan members to reimburse benefits paid to a plan member if the member recovered from a third-party tortfeasor. The Supreme Court held that the Pennsylvania statute "relate[d] to" an employee benefit plan and was thereby preempted. *FMC Corp.*,

498 U.S. at 58, 112 L. Ed. 2d at 364, 111 S. Ct. at 407. The statute required plan providers in Pennsylvania to calculate benefit levels based on expected liability conditions that differed from those in states that had not enacted similar antisubrogation legislation. *FMC Corp.*, 498 U.S. at 60, 112 L. Ed. 2d at 365, 111 S. Ct. at 408-09. The Court found that application of different state subrogation laws to plans would frustrate plan administrators' continuing obligation to calculate uniform benefit levels nationwide. *FMC Corp.*, 498 U.S. at 60, 112 L. Ed. 2d at 365-66, 111 S. Ct. at 408-09.

In contrast to the state statute at issue in *FMC Corp. v. Holliday*, the common fund doctrine does not prohibit employers from structuring their employee benefit plans to require reimbursement of subrogation liens. Scholtens specifically acknowledges the Trustees' right to subrogation under both the benefit plan and the subrogation agreement. He does not seek to modify or avoid his obligation to reimburse the plan for benefits paid to him and does not question the right of the Trustees to collect under the subrogation clause. Moreover, nothing in the trial court's decision relieved Scholtens of his obligation to comply with the terms of the subrogation agreement. In fact, the trial court specifically stated that it did not adjudicate the Trustees' rights under the terms of either the ERISA plan or the subrogation agreement.

The Trustees nevertheless maintain that application of the common fund doctrine in effect requires plan administrators to structure plans to cover attorney fees incurred by beneficiaries in personal injury cases. We disagree. We find that the common fund doctrine does not dictate or restrict the manner in which ERISA plans are structured or administered.

An employee benefit plan is in the nature of a contractual agreement between the employer, the plan

and its fiduciaries, and the participants and beneficiaries. The claim for attorney fees at issue here did not arise out of that contractual agreement or any separate subrogation agreement executed between the Trustees and Scholtens. Rather, the claim for attorney fees arises independently of both the benefit plan and the subrogation agreement. Here, the attorney who represented Scholtens in his tort action, and who negotiated the settlement and obtained the proceeds from which the plan's subrogation lien will be paid, simply invoked his quasi-contractual right to payment of fees for services rendered in recovering the plan's subrogation lien. The quasi-contractual obligation he seeks to impose upon the Trustees arises independently of the benefit plan, resting instead upon equitable considerations of *quantum meruit* and the prevention of unjust enrichment. Accordingly, applying the common fund doctrine under the circumstances of this case does not alter the relationship or agreements formulated among the principal ERISA entities (*e.g.*, the employer, the plan fiduciaries, and the participants). It affects the relations between one of those entities (*i.e.*, the Trustees) and an outside party. In effect, the attorney who performed legal services that ultimately led to the recovery of the plan's subrogation lien instituted a separate and distinct action against the Trustees for unpaid fees. The action, in substance if not in form, is wholly independent of and unrelated to the underlying benefit plan. We conclude, therefore, that the common fund doctrine does not dictate or restrict the manner in which ERISA plans are structured or administered.

Supporting this conclusion is this court's decision in *Baier v. State Farm Insurance Co.*, 66 Ill. 2d 119 (1977). In *Baier*, the plaintiff, an attorney, represented a motorist in a claim for damages arising out of an automobile accident. The attorney ultimately negotiated a settle-

ment of $12,000 between the injured motorist and the tortfeasor. The injured motorist used a portion of the settlement proceeds to reimburse State Farm, pursuant to a subrogation agreement, for $1,000 in medical benefits State Farm had paid the motorist following the accident. Following dismissal of the negligence action, the attorney brought a separate action against State Farm to recover a fee for the services he performed in recovering State Farm's subrogation lien. In that case, as here, there was no allegation that there was a contract of employment, express or implied, between the attorney and State Farm. Rather, the claim for fees was based on the equitable concept that an attorney who performs services in creating a fund should, in equity and good conscience, be allowed compensation from all those who seek to benefit from the fund recovered. *Baier*, 66 Ill. 2d at 124.

In applying the common fund doctrine, the *Baier* court specifically rejected State Farm's claim that application of the doctrine would violate the subrogation agreement between the insured motorist and State Farm. *Baier*, 66 Ill. 2d at 126. Like the *Baier* court, we find that the quasi-contractual obligation to pay fees in this case arises wholly independently of, and is unrelated to, both the subrogation clause in the ERISA plan and the contractual subrogation agreement that Scholtens signed after the accident. The common fund doctrine is invoked by someone who is not a party to the contractual agreement between the plan and its beneficiaries to recover an unpaid debt, namely, a reasonable fee in *quantum meruit* for legal services rendered to the plan and its Trustees.

The Supreme Court has recognized that such actions are not preempted by ERISA in *Mackey*, 486 U.S. at 833, 100 L. Ed. 2d at 846, 108 S. Ct. at 2187. The *Mackey* Court explained:

"These cases—lawsuits against ERISA plans for run-of-the-mill state-law claims such as unpaid rent, failure to pay creditors, or even torts committed by an ERISA plan—are relatively commonplace. Petitioners and the United States (appearing here as *amicus curiae*) concede that these suits, although obviously affecting and involving ERISA plans and their trustees, are not pre-empted by ERISA § 514(a)."

In a footnote, the Court cited a number of cases, including one case involving a suit against an ERISA plan for unpaid attorney fees. *Mackey*, 486 U.S. at 833 n.8, 100 L. Ed. 2d at 846 n.8, 108 S. Ct. at 2187 n.8, citing *Luxemburg v. Hotel & Restaurant Employees & Bartenders International Union Pension Fund*, 91 Misc. 2d 930, 398 N.Y.S.2d 589 (1977). *Luxemburg* allowed an attorney to recover unpaid legal fees from an ERISA plan. Although the suit for unpaid attorney fees in *Luxemburg* was based upon an express contract, while the present action is quasi-contractual in nature, this factual distinction is not relevant to the preemption question raised here. The present suit is equivalent to an action to force an ERISA plan to pay for telephone services or rent. ERISA does not require the creation of a fully insulated legal world that renders all state law preempted whenever there is a plan in the picture. *United Wire, Metal & Machine Health & Welfare Fund v. Morristown Memorial Hospital*, 995 F.2d 1179, 1193 (3d Cir. 1993).

2

The Trustees next claim that the common fund doctrine disrupts the uniform administration of ERISA plans and is thereby preempted because application of the doctrine will significantly increase plan costs. The Trustees have offered no proof in support of this claim, however, and we believe that precisely the opposite result is likely. The Trustees conceded in oral argument that they do not generally bring an independent action against third-party tortfeasors to recover subrogation

liens. Instead, they rely upon the cooperative efforts of injured beneficiaries in suing tortfeasors as the exclusive means of obtaining reimbursement of benefits paid to beneficiaries. Holding that the common fund doctrine is preempted would, in at least some instances, destroy any incentive plan beneficiaries might have to bring independent actions against tortfeasors and, thus, ultimately increase plan costs.

Assume, for instance, that an ERISA plan pays a participant medical benefits totalling $10,000, and the participant ultimately obtains a settlement award of $15,000 from a responsible third party. Under these facts, $10,000 of the settlement proceeds would be paid to the ERISA plan. Assuming a standard one-third contingency fee agreement, the injured worker's attorney would be entitled to the remaining $5,000. At least some plan beneficiaries would not be willing to file an independent civil suit that would result in no benefit to them. Requiring ERISA plans to pay attorney fees under the common fund doctrine, on the other hand, may encourage beneficiaries to pursue independent actions against tortfeasors. Because such actions ultimately result in reimbursement of subrogation liens to ERISA plans, plan costs would thereby be reduced.

Even if we found, however, that application of the common fund doctrine would increase plan costs, that finding would not necessitate a conclusion that the law is preempted under ERISA. The Supreme Court has held that the fact that a state law imposes additional costs on ERISA plans, standing alone, is not a sufficient basis for holding that the law is preempted. *Travelers*, 514 U.S. at 655, 131 L. Ed. 2d at 705, 115 S. Ct. at 1677; *Mackey*, 486 U.S. at 831, 100 L. Ed. 2d at 845, 108 S. Ct. at 2186.

In *Travelers*, a New York statute imposed surcharges on hospital bills of patients covered by commercial in-

surance and health maintenance organizations (HMOs), but not on bills of patients covered by Blue Cross/Blue Shield. The statute ultimately resulted in a 24% surcharge on the bills of commercially insured patients and a 9% surcharge on patients covered by HMOs. Several commercial insurers who were acting as fiduciaries of ERISA plans filed suit, arguing that the statute imposing the surcharges was preempted by ERISA. The Second Circuit Court of Appeals agreed, concluding that the surcharges "related to" ERISA plans because they imposed a "significant economic burden" on such plans and therefore exerted an impermissible impact on ERISA plan structure and administration. *Travelers Insurance Co. v. Cuomo*, 14 F.3d 708, 721 (2d Cir. 1994).

The Supreme Court, in a unanimous opinion authored by Justice Souter, rejected this conclusion and found that the statute imposing the surcharges was not preempted. In reaching this result, the Court acknowledged that the surcharges affected ERISA plans by encouraging insurance buyers, including ERISA plans, to choose certain insurers (*i.e.*, Blue Cross) over other insurers. *Travelers*, 514 U.S. at 658, 131 L. Ed. 2d at 707, 115 S. Ct. at 1679. The Court nevertheless concluded that the statute was not preempted, because an "indirect economic influence *** does not bind plan administrators to any particular choice *** [or] preclude uniform administrative practice or the provision of a uniform interstate benefit package ***. It simply bears on the costs of benefits and the relative costs of competing insurance to provide them." *Travelers*, 514 U.S. at 659-60, 131 L. Ed. 2d at 707-08, 115 S. Ct. at 1679. The Court concluded that "laws with only an indirect economic effect on the relative costs of various health insurance packages in a given State are a far cry from those 'conflicting directives' from which Congress meant to insulate ERISA plans." *Travelers*, 514 U.S. at 662, 131 L. Ed. 2d at 709, 115 S. Ct. at 1680.

Likewise, application of the common fund doctrine does not "bind plan administrators to any particular choice *** [or] preclude uniform administrative practice or the provision of a uniform interstate benefit package." Regardless of the common fund doctrine, a plan may choose to initiate its own action against responsible tortfeasors to recoup benefits paid to plan beneficiaries. In such circumstances, the plan must employ legal counsel, file a lawsuit and expend litigation costs. A plan may also choose to wait for the injured person to seek compensation from a responsible third party and then enforce its right to subrogation under the benefit plan. Where an attorney performs legal services on the plan's behalf, however, the plan has a legal obligation to pay that attorney a reasonable fee for those services. It may not simply accept the fruits of an attorney's labor without paying a reasonable fee for the legal services rendered. Had the Trustees hired independent counsel to pursue their subrogation lien and then, after services were rendered, inexplicably refused to pay the bill for such services, we would not hesitate to obligate them to pay. The preemption provision of ERISA does not compel a different result here simply because we are dealing with a quasi-contractual obligation to pay for legal services. "[I]f ERISA is held to invalidate every state action that may increase the cost of operating employee benefit plans, those plans will be permitted a charmed existence that never was contemplated by Congress." *United Wire*, 995 F.2d at 1194, citing *Rebaldo v. Cuomo*, 749 F.2d 133 (2d Cir. 1984).

Our conclusion is also supported by the Supreme Court's decision in *Mackey*. The Court there held that ERISA's preemption provision did not bar application of a general state garnishment statute to participants' benefits under an ERISA plan, even though garnishment imposed administrative costs and burdens on ben-

efit plans. The Court acknowledged that, when a plan was garnished by creditors under the statute, plan trustees were served with garnishment summons, became parties to a suit, and ultimately deposited the funds that they would otherwise hold or pay out to beneficiaries. Although compliance with the state law admittedly subjected ERISA plans to substantial administrative burdens and costs, the Court nevertheless found that the statute did not "relate to" benefit plans within the meaning of section 514(a). *Mackey,* 486 U.S. at 831, 100 L. Ed. 2d at 845, 108 S. Ct. at 2186.

In sum, we have before us a generally applicable common law doctrine which (1) is not intended to regulate the affairs of ERISA plans, (2) neither singles out such plans for special treatment nor predicates rights or obligations on the existence of an ERISA plan, and (3) does not have either the effect of dictating or restricting the manner in which ERISA plans structure or conduct their affairs or the effect of impairing their ability to operate simultaneously in more than one state. The purpose of ERISA is to protect employees, not to provide loopholes through which ERISA plans can avoid paying their debts. We therefore decline to hold that the common fund doctrine is preempted by section 514(a). Without explicit direction, we would not ascribe to Congress the intention to void existing general provisions of state law protecting the very beneficiaries of the ERISA statute.

### 3

As a final matter, we reject the Trustees' claim that we are bound to follow statements made in a decision of the Seventh Circuit Court of Appeals in *Land v. Chicago Truck Drivers, Helpers & Warehouse Union Health & Welfare Fund,* 25 F.3d 509 (7th Cir. 1994), to the effect that the common fund doctrine may not be applied to ERISA benefit plans. The statements in *Land* concern-

ing the common fund doctrine are pure *dicta*. See *Carpenter v. Modern Drop Forge Co.*, 919 F. Supp. 1198, 1205 (N.D. Ind. 1995). The question raised in this appeal—namely, whether the common fund doctrine "relates to" and is therefore preempted by section 514(a) of ERISA—was never raised or decided in *Land*. The plaintiff in *Land* did not invoke the common fund doctrine in either the district or the appeals court. *Land*, 25 F.3d at 513; *Modern Drop Forge Co.*, 919 F. Supp. at 1205 n.5. Rather, the only substantive issue the *Land* court decided was that ERISA did not unconstitutionally delegate legislative authority to private welfare benefit plans. *Land*, 25 F.3d at 512-13 (court also addressed a procedural matter and held that the plaintiff's attempt to challenge the plan's denial of benefits to him pursuant to a section 1983 cause of action warranted Rule 11 sanctions). Therefore, we are not bound by the language upon which the Trustees rely.

## CONCLUSION

For the reasons stated above, we hold that any effect the common fund doctrine has upon employee benefit plans is simply too tenuous, remote or peripheral to warrant a finding that the doctrine "relates to" such plans. We therefore conclude that the doctrine is outside the scope of ERISA's preemption provision (29 U.S.C. § 1144(a) (1982)). The Trustees are obligated to pay the reasonable value of the legal services rendered in protecting their subrogation lien. Accordingly, the appellate court judgment affirming the trial court's judgment holding the Trustees liable for the legal expenses incurred in protecting their subrogation lien is affirmed.

*Affirmed.*